FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

2013 JUL 12  P 4: 26

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| SHEE ATIKÁ LANGUAGES, LLC, a limited liability company organized under the laws of the State of Alaska with its principal place of business in Sitka, Alaska,<br><br>and<br><br>THE SHEE ATIKÁ LANGUAGES, LLC, LIQUIDATING TRUST, a trust organized under the laws of the State of Alaska with its principal place of business in Sitka, Alaska,<br><br>      Plaintiffs,<br><br>v.<br><br>GLOBAL LINGUIST SOLUTIONS, LLC, a limited liability company organized under the laws of the State of Delaware with its principal place of business in Falls Church, Virginia,<br><br>      SERVE:<br><br>      CT Corporation System,<br>      Registered Agent<br>      4701 Cox Road, Suite 300<br>      Glen Allen, Virginia 23060-6802<br><br>      Defendant. | Case No. 1:13cv850 LMB/TRJ<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs Shee Atiká Languages, LLC ("SAL") and The Shee Atiká Languages, LLC, Liquidating Trust (the "Trust") (collectively, "The Shee Atiká Plaintiffs"), by counsel, respectfully state as follows for their Complaint against Defendant Global Linguist Solutions, LLC ("GLS").

4827-6380-2387.15

## NATURE OF THE ACTION

1.      The Shee Atiká Plaintiffs' Complaint arises out of a December 21, 2007 subcontract between SAL and GLS (the "SAL Subcontract").[1]  By using SAL as a subcontractor, GLS was able to secure and perform a lucrative multibillion dollar contract from the U.S. Army (the "Prime Contract").[2]  The Prime Contract authorized the U.S. Army to pay GLS as much as $4,645,000,000.  The scope of the Prime Contract included, but was not limited to, translation and interpretation services related to U.S. military operations in Iraq and Afghanistan.

2.      The contributions of SAL helped ensure that GLS received the benefit of its bargain with the U.S. Army under the Prime Contract.  SAL, however, has *not* received the benefit of its bargain with GLS under the SAL Subcontract.  Rather than honor its promises to SAL, GLS has breached a number of material provisions of the SAL Subcontract, including: (1) the "Guaranteed Work Share Provision," (2) the "Prompt Payment Provision," and (3) the "Award Fee Provision."

3.      First, GLS breached the "Guaranteed Work Share Provision" of the SAL Subcontract. The Guaranteed Work Share Provision reflected GLS' promise that SAL would receive subcontract revenue equal to 15% of the total revenue that GLS received under the Prime Contract. As amended by Mod 3, Article IX of the SAL Subcontract stated: "The total value of all orders placed under this Subcontract shall not exceed $696,750,000.00." (FRE 1006 SAL Subcontract Summary at 9).  Consistent with the Guaranteed Work Share Provision, the SAL Subcontract thus had a dollar value "ceiling" equal to 15% of the $4,645,000,000.00 dollar

---

[1] The provisions of the December 21, 2007 Subcontract Agreement No. INSCOM-SHEE ATIKA-0001 between GLS and SAL (the "SAL Subcontract") as subsequently modified by the parties are set forth in the Federal Rule of Evidence 1006 Summary of Subcontract Agreement Provisions attached as **Exhibit A** (cited herein as "FRE 1006 SAL Subcontract Summary").

[2] The Prime Contract is U.S. Government Prime Contract No. W911W4-08-D-0002 awarded by the U.S. Army Intelligence and Security Command in Fort Belvoir, Virginia.

value "ceiling" of the Prime Contract ($4,645,000,000.00 X 15% = $696,750,000.00). Throughout the term of the SAL Subcontract, GLS repeatedly represented to SAL that it had awarded or would award subcontract work sufficient to satisfy the Guaranteed Work Share Provision. Not only did GLS fail to do so, GLS attempted to hide its breach from SAL by refusing to provide SAL with the relevant data needed for SAL to calculate the percentage of total Prime Contract revenues actually awarded to SAL pursuant to the SAL Subcontract. To make matters worse, GLS conspired with one or more of its other subcontractors (the "Conspiring Subcontractor(s)") for the purpose of diverting to them the benefits of the work that GLS had promised to SAL.

4.      Second, in connection with the payment of certain SAL invoices, GLS breached various provisions of the SAL Subcontract, including the "Prompt Payment Provision." In an attempt to justify its failure to pay SAL substantial amounts due under the SAL Subcontract, GLS tried to rely upon the fact that a government auditing agency (the Defense Contract Audit Agency or "DCAA") had questioned certain costs that SAL had incurred and billed to GLS and that GLS had, in turn, billed to the U.S. Army. With respect to the costs that DCAA had questioned, the U.S. Army withheld payment from GLS and requested substantiation for such costs. Although GLS had already paid the costs at issue to SAL, it later offset the amount at issue from subsequent SAL invoices. By doing so, GLS breached a number of provisions of the SAL Subcontract. The SAL Subcontract obligates GLS to reimburse SAL's costs so long as such costs are allowable. The costs at issue are, in fact, allowable and GLS has never claimed otherwise. Under the plain language of the SAL Subcontract, the government's questioning of the costs is not a valid reason for GLS to withhold payment from SAL. Rather, the "Prompt Payment Provision" of the SAL Subcontract expressly obligates GLS to pay SAL with 60 days

3

even if GLS has not obtained payment from the U.S. Army. Moreover, under the Prompt Payment Provision, GLS had only limited time to review and question SAL's invoices, and GLS did not do so in this case.

5.      Third, GLS breached the "Award Fee Provision" of the SAL Subcontract. The Award Fee Provision entitled SAL to a pro rata share of any award fees paid by the U.S. Army to GLS under the Prime Contract. As GLS has repeatedly acknowledged in writing, SAL's contributions helped ensure that GLS received substantial award fees under the Prime Contract. Yet GLS has never paid *any* portion of such award fees to SAL—much less the 15% to which SAL is contractually entitled.

**FACTUAL BACKGROUND**

6.      In its winning bid to the U.S. Army, GLS identified SAL by name as a subcontractor it would use if awarded the Prime Contract. SAL (including its members and their respective affiliates) had a proven track record of providing high quality interpreter and translation services of the type that the U.S. Army was seeking. And because SAL was a majority owned and controlled subsidiary of a "Native Corporation" within the meaning of the Alaska Native Claims Settlement Act ("ANCSA"), SAL's participation helped GLS satisfy the government's requirement that specified minimum percentages of the revenue under the Prime Contract be paid to subcontractors that qualified as "small business" or "small disadvantaged business." This requirement is among the reasons that the SAL Subcontract entitled SAL to receive work equal to 15% of the total value of the Prime Contract.

4

7.    In his testimony on August 12, 2009 before the Commission on Wartime Contracting (the "Wartime Commission"), Mr. John W. Houck, the former General Manager of GLS,[3] elaborated on its solicitation of the Prime Contract and its strategy for winning it:

> *GLS adopted a "best value" competitive strategy to provide linguists in Iraq. We designed a team of small businesses in response to solicitation requirements to maximize evaluation points.* The GLS prime contract contains the required FAR/DFAR clauses for subcontracting and the requirements for the use of small business subcontractors specified in the INSCOM solicitation (W911W4-05-R-0001). In summary, the solicitation requires 25% small business participation and a 5% requirement for small disadvantaged businesses, 5% for woman owned businesses, 3% to HUB Zone small businesses and 3% to serviced disabled small businesses. The additional requirements are a subset of the overall 25% requirement. ... In August 2007, INSCOM amended the solicitation and requested compliant proposals. *GLS increased its proposed small business subcontracting percentage (the amended solicitation provided for increased competitive evaluation points for small business participation greater than 25%) leading to an adjustment of the GLS teaming structure to maximize the potential evaluation score. As a result, GLS invited Shee Atika Languages, LLC (SAL) to join the team based on its past performance, corporate management experience and available linguists associated with a previous contract award from the U.S. Army. Because of this addition to the team, the work shares for all team subcontractors were adjusted to support a proposal strategy to achieve a 35% small business participation.*

(Ex. B at 2) (emphasis added).    By its own admission, GLS specifically added SAL to "maximize [its] potential evaluation score." GLS did so by subcontracting a 35% work share to small businesses such as SAL. At that time, it was clear to the U.S. Army, the Wartime Commission, GLS, and its subcontractors that this small business participation and work share percentage were based on a percentage of the total contract revenue. Indeed, it was on that basis that GLS was awarded the Prime Contract.

8.    The Prime Contract and the SAL Subcontract were "cost reimbursement" contracts within the meaning of the Federal Acquisition Regulation ("FAR"), 48 C.F.R. 16.301-

---

[3] A copy of Mr. Houck's August 12, 2009 testimony before the Wartime Commission is attached as **Exhibit B** (cited herein by page as "Ex. B").

1. Such a contract entitles the contractor to reimbursement for all of its allowable costs up to a specified ceiling. That means that GLS' allowable costs in performing the Prime Contract were to be reimbursed by the U.S. Army and that, in turn, SAL's allowable costs in performing the SAL Subcontract were to be reimbursed by GLS.

9.      Under the terms of the Prime Contract, in addition to the reimbursement of allowable costs, GLS was potentially entitled to one or more types of fees (*i.e.*, profit) from the U.S. Army.  Likewise, SAL was entitled to fees from GLS under the SAL Subcontract. Specifically, SAL was entitled to be paid by GLS both a fixed fee equal to 5.75% of the estimated costs and a *pro rata* portion of any award fee paid by the U.S. Army to GLS.

10.     Since being awarded the Prime Contract, GLS has repeatedly acknowledged the critical role that SAL played in helping GLS obtain and perform the contract.  In subsequent performance reviews submitted to the U.S. Army, GLS ranked SAL's quality as "outstanding" beginning with "the initial proposal development" and continuing "through detailed execution of all taskings." (Ex. C, December 1, 2008 at 3).[4]  In fact, GLS consistently gave SAL the highest possible rating in each of five categories—including not only "Quality" but also "Cost Control," "Business Relations," "Timeliness of Performance," and "Customer Satisfaction."  (Ex. C, December 1, 2008 at 3).

11.     The U.S. Army announced the award of the Prime Contract to GLS in December 2006. It took more than a year, however, for subsequent bid protests to be resolved.  As a result, GLS did not actually secure the Prime Contract until December 5, 2007—thereby delaying execution of the SAL Subcontract until December 21, 2007.  In this regard, GLS' subsequent performance reviews of SAL:

---

[4] Copies of GLS' performance reviews of SAL dated December 1, 2008 and November 9, 2009 are attached as **Exhibit C** (cited herein by review date and page as "Ex. C").

4827-6380-2387.15

        a.     "highlight[ed] that SAL remained with GLS throughout the 2+ years that it took to finally get the work started … as a result of all of the 'protests' and 'stays of performance'" and that "[t]hroughout that period, SAL continually stepped up to support the team with people and resources, at its own expense;"

        b.     observed that "SAL's senior leadership team and functional experts were always available and could be counted on to respond within hours;" and

        c.     concluded that "GLS is very fortunate to have such a diverse and robust partner to help drive the team's overall successes."

(Ex. C, December 1, 2008 at 3).

      12.     Both the Prime Contract itself and the "Guaranteed Work Share Provision" of the SAL Subcontract are explicit that SAL was entitled to "15% of the services to be provided under the Prime Contract." (FRE 1006 SAL Subcontract Summary at Preamble and Article VIII [pp. 1, 9]). As part of the 15% share of Prime Contract revenues to which SAL was entitled under the Guaranteed Work Share Provision, the SAL Subcontract entitled SAL to a fee equal to 5.75% of its estimated costs. SAL was also entitled to a pro rata share (15%) of any award fee that GLS received under the Prime Contract.

      13.     At no time during the term of the SAL Subcontract did GLS ever provide SAL with sufficient work to satisfy the Guaranteed Work Share Provision. SAL nevertheless continued to contribute to GLS' successful performance of the Prime Contract, thereby helping GLS obtain follow-on work for the U.S. Army. To induce SAL to continue making its exemplary contributions, GLS repeatedly promised to make up the deficiency so that SAL would receive revenue equal to 15% of the Prime Contract revenue to which it was entitled. After securing the award of a new prime contract (the "Successor Prime Contract"), however, GLS

repudiated and reneged upon its promises and contractual obligations to SAL under the SAL Subcontract. Rather than award SAL additional subcontract work under the Prime Contract or the Successor Prime Contract, GLS awarded it to the Conspiring Subcontractor(s).

14.     The Successor Prime Contract was known as "DLITE," an acronym for "Department of Defense Language Interpretation and Translation Enterprises." The Successor Prime Contract called for the provision of essentially the same services as those that were the subject of the original Prime Contract except that—rather than being limited to the Persian Gulf region—it was worldwide in geographic scope. In addition, the term of the Successor Prime Contract extended beyond the scheduled expiration date of the Prime Contract.

15.     The Successor Prime Contract was of such magnitude ($9.7 billion, in the aggregate) that, upon its award to GLS, the two members of the LLC—DynCorp International LLC ("DynCorp") and AECOM NSP (National Security Programs), f/k/a McNeil Technologies ("AECOM")—issued the July 12, 2011 Business Wire announcement attached as **Exhibit D**. Soon after DynCorp and AECOM announced that GLS had obtained the Successor Prime Contract, GLS explicitly and unjustifiably repudiated its obligations to SAL under the Guaranteed Work Share Provision of the SAL Subcontract. Thereafter, GLS did nothing to ensure that SAL received revenue from GLS that—in the aggregate—added up to 15% of the total revenue that GLS received under the Prime Contract. To the contrary, GLS disclaimed any obligation to do so. Rather than honor its contractual obligations to SAL, GLS awarded to the Conspiring Subcontractor(s) work to which SAL was entitled under the Guaranteed Work Share Provision.

16.     Under the SAL Subcontract, GLS was obligated to provide SAL with a Monthly Status Report showing:

4827-6380-2387.15

        a.      the total revenue received by GLS under the Prime Contract ("Total GLS Revenue");

        b.      the total revenue received by SAL under the Subcontract ("Total Vendor Revenue"), and

        c.      the percentage of the Prime Contract that had been awarded to SAL ("Percentage of GLS Revenue").

More often than not, GLS did not provide SAL with the Monthly Status Reports to which it was entitled. Had GLS done so, the Monthly Status Reports would have confirmed that at no time after the effective date of the Subcontract did SAL ever receive the 15% of Prime Contract revenue to which it was entitled under the Guaranteed Work Share Provision. A compilation of representative Monthly Status Reports is attached as **Exhibit E**.

17.      Both orally and in writing, SAL repeatedly reminded GLS of its failure to honor its obligations to SAL under the Guaranteed Work Share Provision. Following a series of informal attempts to secure GLS' compliance with the Guaranteed Work Share Provision, SAL sent GLS written notice of GLS' failure to do so and met with GLS on multiple occasions. An example of such a notice, dated July 1, 2009, is attached as **Exhibit F**. SAL's efforts to secure GLS' compliance with the Guaranteed Work Share Provision continued through and after July 1, 2011, when GLS was awarded the Successor Prime Contract. Shortly thereafter, SAL met with GLS at GLS' Northern Virginia headquarters on July 14, 2011. Following that meeting, GLS abandoned all pretense that it had any intention of complying with the Guaranteed Work Share Provision. Instead, on August 12, 2011, GLS sent SAL the email attached as **Exhibit G** ("GLS' Repudiation of the Guaranteed Work Share Provision").

9

18.     GLS' Repudiation of the Guaranteed Work Share Provision claimed that "the current approach to work share measurement"—an "approach" that had been reflected in the Monthly Status Reports generated by GLS throughout the course of the parties' relationship— was somehow "inconsistent with our contract language." GLS' Repudiation of the Guaranteed Work Share Provision announced that GLS was implementing unilaterally what it called "a mid course adjustment" to its calculation of the percentage of the Prime Contract revenues that were required to be awarded to SAL. As a result of this "mid course adjustment," GLS proceeded to calculate the percentage of Prime Contract revenues awarded to SAL through June 30, 2011 in a manner different from that required by the SAL Subcontract. A copy of "GLS' Adjusted Status Report" is attached as **Exhibit H**. Although dated July 18, 2011, GLS' Adjusted Status Report was not sent to SAL until nearly a month later. On August 12, 2011, GLS attached the Adjusted Status Report to the email containing GLS' Repudiation of the Guaranteed Work Share Provision. This "mid course adjustment" had the effect of improperly inflating GLS' calculation of the percentage of the work under the Prime Contract that GLS was allowing SAL to perform. Even with this "mid course adjustment," however, GLS' Adjusted Status Report showed an "Allocation %" of only 13.59%—still below the 15% to which SAL was entitled by virtue of the Guaranteed Work Share Provision. GLS' Repudiation of the Guaranteed Work Share Provision acknowledged this deficiency and claimed that "[p]rojections through the end of December [2011] reflect work shares that will exceed 15%."

19.     GLS' Repudiation of the Guaranteed Work Share Provision announced that GLS would not "process any further linguist migrations." This choice of words reflected the fact that, under the SAL Subcontract, GLS was responsible for hiring all linguists working on the Prime Contract. To award additional work to SAL under the SAL Subcontract, GLS would thus have

4827-6380-2387.15

to "migrate," *i.e.* transfer, to SAL other linguists who were employed by GLS or another subcontractor. Thereafter, GLS did not "process any further linguist migrations.". Subsequent efforts by SAL to get GLS to comply with its obligations to SAL under the Guaranteed Work Share Provision were unavailing.

20.     After sending its Repudiation of the Guaranteed Work Share Provision on August 12, 2011, GLS awarded the Conspiring Subcontractor(s) work to which—under the Guaranteed Work Share Provision—SAL was contractually entitled.  GLS did not award any subcontract work to SAL under the Successor Prime Contract or otherwise try to make up the work share deficiency under the SAL Subcontract.  After the award of the Successor Prime Contract, even though the Prime Contract and the SAL Subcontract remained in effect, the amount of work that GLS awarded SAL under the SAL Subcontract continued to dwindle.  SAL has since been dissolved and has assigned to the Trust the right to assert the claims against GLS that are the subject of this Complaint.

21.     Separately, in breach of the SAL Subcontract's "Prompt Payment Provision"— which obligated GLS to remit payment of SAL's invoices within 60 days—GLS withheld payments to SAL totaling $5,373,289.  GLS' purported justification for the withholding was that a DCAA review had questioned certain charges by GLS.  These charges reflected costs incurred by SAL and charged to GLS in the aggregate amount of $5,373,289.  Pending submission of an explanation for the charges in question, the U.S. Army suspended payment of those charges to GLS.  Under the SAL Subcontract, however, the fact that the DCAA had questioned these charges did not entitle GLS to withhold payment from SAL.

22.     In May 2010, when DCAA initially questioned some of GLS' charges that related to SAL's costs, SAL quickly started working with GLS toward a mutually agreeable solution.

4827-6380-2387.15

After further analysis, SAL agreed that a fraction of the costs might not have been allowable and issued a credit to GLS for the amount of those costs (approximately $1.3 million) in June 2010. SAL also provided a justification (including supporting documents) for the remaining costs that had been questioned by DCAA. Representatives of SAL and GLS subsequently met in person with DCAA personnel to discuss the justification, to the satisfaction of GLS. However, GLS later decided to withhold the entire $5,373,289 that had been questioned by the DCAA (*i.e.*, the credit in the amount of approximately $1.3 million that SAL had provided *plus* an additional amount of approximately $4 million). GLS did so by offsetting roughly $4 million against money owed by GLS to SAL on subsequent, unrelated SAL invoices.

23.    To this day, GLS continues to withhold payment of the entire $5,373,289 even though SAL provided additional substantiation for at least $3,717,522 of the charges in question (the "Unrefuted Costs"). SAL provided additional substantiation as part of the March 28, 2012 claim attached as **Exhibit I** ("SAL's Certified Claim"). SAL's Certified Claim demanded that GLS reimburse SAL for the Unrefuted Costs. To date, however, GLS has yet to do so.

24.    Under the Prime Contract, only GLS could seek payment from the U.S. Army of any charges that had been questioned by the DCAA—including the Unrefuted Costs. GLS' apparent failure to even try to resolve the issue with the U.S. Army does not excuse its obligation to comply with the Prompt Payment Provision. GLS was obligated by the Prompt Payment Provision to remit payment to SAL of at least the Unrefuted Costs—in the aggregate amount of $3,717,522—within 60 days of receiving SAL's invoices. Not only did GLS fail to meet this deadline, it improperly offset that amount against unrelated SAL invoices. In further breach of the Prompt Payment Provision, GLS took the offset more than 60 days after learning that the DCAA had questioned the costs. GLS also failed to remit payment within 60 days of receiving

12

SAL's Certified Claim on March 28, 2012. Again, submission of such a Certified Claim was not a prerequisite for payment. Rather, GLS' payment obligations were triggered by the prior submission of SAL's invoices. To this day, GLS *still* has not remitted payment for the Unrefuted Costs. GLS' failure to make such payment is among the breaches of the SAL Subcontract for which The Shee Atiká Plaintiffs seek recovery by way of this Complaint.

25.     In addition to breaching the Guaranteed Work Share and Prompt Payment Provisions, GLS has also failed to honor its obligations to SAL under the "Award Fee Provision" of the SAL Subcontract. The Award Fee Provision of the SAL Subcontract, as set forth in the Statement of Work, is as follows:

5.0     Performance Requirements/Award Fee Criteria

The Subcontractor will normally receive the same Award Fee as the Prime Contractor unless the Subcontractor presents strong and completing [sic] justification as to why they [sic] should receive a higher award fee then [sic] the rest of the GLS team.

(FRE 1006 SAL Subcontract Summary at Exhibit C (Statement of Work), § 5.0 [p. 85]). Under the Award Fee Provision of the SAL Subcontract, when read in conjunction with the Guaranteed Work Share Provision, SAL was thus entitled to at least 15% of whatever award fee GLS received under the Prime Contract.

26.     Whether GLS received an award fee under the Prime Contract and the amount of any such award fee were at the discretion of the federal government. During the term of the SAL Subcontract, GLS received award fees under the Prime Contract. As a result, the SAL Subcontract entitles SAL to receive an award fee from GLS at least equal to its proportionate share of the award fee to GLS.

27.     In short, the amount of the total award fee to which GLS was entitled under the Prime Contract was variable and dependent upon certain objective and subjective criteria used by

the U.S. Army.  At that point, the amount of the award fee to which SAL was entitled was—at a minimum—a fixed pro rata amount based upon its pro rata share.

28.     During the term of the Prime Contract and the SAL Subcontract, GLS stated that it "continually received the highest average Award Fees in the history of nearly 9 years of this and the previous contract." (Ex. C, November 9, 2009 at 8).  Indeed, the award fees were substantial enough to be "material" to one or more of the entities comprising GLS.[5]  GLS has also acknowledged—at least to the federal government—the critical role that SAL played in GLS' receipt of award fees.  *See* Ex. C, November 9, 2009 at 8 ("SAL has been a major contributor to those successes and USAINSCOM's satisfaction").  Yet GLS has never paid SAL its proportionate share—at least 15%—of such award fees.

29.     The Shee Atiká Plaintiffs therefore seek the following remedies:

        a.     compensatory damages from GLS for breach of the Guaranteed Work Share Provision, the Prompt Payment Provision, the Award Fee Provision, and other provisions of the SAL Subcontract;

        b.     to the extent that SAL has conferred benefits on GLS beyond those required by the SAL Subcontract, compensatory damages for unjust enrichment;

        c.     an accounting of all revenues, credits, and refunds received by GLS pursuant to the Prime Contract and the Successor Prime Contract, including award fees;

        d.     an accounting of the disbursement of such revenues (including award fees) to SAL, other GLS subcontractors—including the Conspiring Subcontractor(s), and the LLC members of GLS;

---

[5] An example of a GLS' member's reporting of Prime Contract award fees is attached as **Exhibit J**.

4827-6380-2387.15

e.      for the benefit of The Shee Atiká Plaintiffs, imposition of a constructive trust with respect to such revenues against GLS; GLS' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with GLS and its officers, agents, servants, employees, and attorneys—including the Conspiring Subcontractor(s) and the LLC members of GLS; and

f.      treble damages and costs and attorneys' fees for violation of the Virginia Business Conspiracy Statute, Va. Code §§ 18.2-499 and 18.2-500.

## THE SHEE ATIKÁ PLAINTIFFS

### (SAL)

30.     SAL is a limited liability company organized under the laws of the State of Alaska with its principal place of business in Sitka, Alaska.

31.     SAL is 51% owned and controlled (including for purposes of electing a Management Board) by Shee Atiká Incorporated ("SAI"). SAI is a Native Corporation within the meaning of the ANSCA. As a majority owned and controlled subsidiary of a Native Corporation, SAL itself is an "Alaska Native Corporation" or "ANC" within the meaning of FAR 19.701 (48 C.F.R. § 19.701).

32.     As a limited liability company, SAL is—for diversity purposes—a citizen of every state of which each of its members is a citizen. *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114 (4th Cir. 2004). The members of SAL are as follows:

a.      SAI, a corporation organized under the laws of the State of Alaska with its principal place of business in Sitka, Alaska (51% ownership); and

b.      Lawrence P. Costa ("Mr. Costa"), an individual residing in Nottingham, New Hampshire (49% ownership).

4827-6380-2387.15

For diversity purposes, a corporation is a citizen of the state in which it is incorporated and the state in which it has its principal place of business. 28 U.S.C. § 1332(c). For diversity purposes, SAL is thus a citizen of Alaska and New Hampshire.

### (The Trust)

33.    The Trust is a trust organized under the laws of the State of Alaska with its principal place of business in Sitka, Alaska.

34.    The trustees of the Trust are as follows:

    a.    Kenneth M. Cameron ("Mr. Cameron"), President/CEO and Chairman of the Board of Directors of SAI and an individual resident of Sitka, Alaska;

    b.    Pamela Steffes ("Ms. Steffes"), Vice Chairman of the Board of Directors of SAI and an individual resident of Sitka, Alaska; and

    c.    Mr. Costa.

35.    The beneficiaries of the Trust are SAI and Mr. Costa, in proportion to their respective ownership of SAL.

36.    Various district courts in the Fourth Circuit have analyzed the citizenship of trust differently. Some have concluded that the citizenship of a trust is determined by the citizenship of both the trustees and the beneficiaries. *See, e.g., Mecklenburg County v. Time Warner Entertainment-Advance/Newhouse P'ship*, 2010 U.S. Dist. LEXIS 6215, *10,*11 (W.D.N.C. 2010). In one case, the U.S. Bankruptcy Court for the Eastern District of Virginia analyzed the citizenship of a trust by looking at the citizenship of the beneficiaries alone. *Dalkon Shield Claimants Trust v. MacLeod (In re A.H. Robins Co.)*, 1995 Bankr. LEXIS 2068, *12 (Bankr. E.D. Va. 1995). In that case, however, the citizenship of the trustees was irrelevant because the citizenship of the beneficiaries alone destroyed diversity. Finally, at least one district court in the Fourth Circuit has held that the citizenship of a trust is determined by the citizenship of its

16

trustee(s) alone. *Schaftel v. Highpointe Business Trust*, 2012 U.S. Dist. LEXIS 8118, **4-6 (D. Md. 2012). Regardless of which test this Court applies, for diversity purposes, the Trust is a citizen of Alaska and/or New Hampshire.

## DEFENDANT GLS AND ITS LLC MEMBERS

### (GLS)

37.    GLS is a limited liability company organized under the laws of the State of Delaware with its principal place of business in the Commonwealth of Virginia. GLS' principal place of business is located at 3190 Fairview Park Drive, Suite 1000, Falls Church, Virginia 22042.

38.    The LLC members of GLS are DynCorp and AECOM.

39.    For diversity purposes, GLS is a citizen of Delaware, Virginia, and Texas based upon the citizenship of its members, DynCorp and AECOM.

### (DynCorp)

40.    DynCorp is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Fort Worth, Texas. DynCorp transacts business in the Commonwealth of Virginia, including at 3190 Fairview Park Drive, Suite 1000, Falls Church, Virginia 22042.

### (AECOM)

41.    AECOM is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in the Commonwealth of Virginia. AECOM's principal place of business is 6564 Loisdale Court, Suite 900, Springfield, Virginia 22150.

4827-6380-2387.15

## JURISDICTION AND VENUE

42.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and because the amount in controversy of this action exceeds $75,000, exclusive of interests and costs.

43.     This Court has general and specific personal jurisdiction over GLS because GLS resides in the Eastern District of Virginia and has engaged in systematic and continuous contacts in the Eastern District of Virginia by doing business in this judicial district and by engaging in activity in the Eastern District of Virginia that gives rise to the claims asserted herein.

44.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(a) because GLS resides in this judicial district, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the Eastern District of Virginia.

45.     Venue is proper in the Alexandria Division pursuant to Local Rule 3(c) because a substantial part of the events giving rise to the claims asserted herein occurred in the Alexandria Division, where GLS resides.

## FACTS COMMON TO ALL COUNTS

**(SAL's Involvement in GLS' Preparation and Submission of its
Winning Bid for the Prime Contract and
GLS' Recognition of SAL's Exemplary Performance)**

46.     On August 17, 2007, before entering into the Subcontract, GLS and SAL entered into the "Exclusive Teaming Agreement" attached as **Exhibit K** (the "Teaming Agreement"). The Teaming Agreement contemplated that the parties would enter into a subcontract if GLS were awarded the Prime Contract and stated as follows:

> If GLS is awarded a prime contract for the Program that includes the [linguist support] work covered by the RFP then GLS shall offer exclusively to [SAL] a subcontract covering such work in a form to be agreed to by the parties. The parties will negotiate in good faith and exercise their best efforts to reach agreement on the provisions to be included in the subcontract for the work

described in the RFP, including any modifications in scope of work and cost made necessary by modifications to the RFP.

47. On August 31, 2007, Mr. Stephen Agrati, (Acting) Vice President in charge of Program Support for GLS sent the correspondence attached as **Exhibit L** to Mr. Robert Loiselle. Mr. Loiselle was at the time the President of SAI and the President and CEO of SAL. In that August 31, 2007 correspondence, Mr. Agrati noted that "GLS faces significant competition to re-win the linguist support contract from INSCOM and as your prime, GLS is 'leaving no stone unturned' in our efforts to defeat L3/Titan in the next competition."

48. In furtherance of its efforts to win the Prime Contract, GLS asked SAL by way of the August 31, 2007 letter to lower its bid so that the GLS-SAL team could be as competitive as possible with the other bidders. The letter ended with the following statement: "Thank you for being part of the world's best linguist contractor team and for your continued support for our joint endeavor." SAL complied with GLS' request, and the team won the bid.

49. In federal government contracting, the subcontractor plan proposed by a prospective prime contractor is a required part of the bid. The subcontractor plan is very important to winning "best value" contracts—such as the Prime Contract that was awarded to GLS in this case. Including small disadvantaged businesses and Native American-owned businesses such as SAL improves the subcontractor plan from the perspective of those awarding the prime contract. The inclusion of a Native American subcontractor such as SAL also potentially qualifies the prime contractor (in this case, GLS) for a refund of 5% of the amounts paid to the Native American subcontractor under the Indian Incentive Program, based on Section 504 of the Indian Financing Act of 1974, 25 U.S.C. § 1544. The inclusion in the subcontractor plan of small disadvantaged businesses, Native American-owned businesses, and other groups that further the U.S. Army's socio-economic policies is a significant consideration in

19

determining which company presents the best overall value to the federal government. *See generally* FAR 19.701-708 (48 C.F.R. § 19.701-708) ("The Small Business Subcontracting Program"). In this case, the inclusion of SAL as a subcontractor certainly played a role in the U.S. Army's award of the Prime Contract to GLS, according to Mr. Houck's August 12, 2009 testimony before the Wartime Commission:

> [T]o maximize the potential evaluation score ... GLS invited Shee Atika Languages, LLC (SAL) to join the team based on its past performance, corporate management experience and available linguists associated with a previous contract award from the U.S. Army.

(Ex. B at 2).

50. As envisioned in the Teaming Agreement, after winning the bid, GLS formalized its relationship with SAL by entering into the SAL Subcontract on December 21, 2007. The SAL Subcontract expressly superseded the Teaming Agreement.

51. As part of its reporting requirements to the U.S. Army under the Prime Contract, GLS had to perform periodic reviews of its subcontractors. GLS consistently gave SAL the highest possible rating in each of five categories—including not only "Quality" but also "Cost Control," "Business Relations," "Timeliness of Performance," and "Customer Satisfaction." (Ex. C, December 1, 2008 at 3).

52. As late as July 14, 2011—just before GLS' Repudiation of the Guaranteed Work Share Provision—at a meeting at GLS' Northern Virginia headquarters, GLS told SAL that it was doing well and that there were no performance issues. Notes of this July 14, 2011 meeting are attached as **Exhibit M**.

**(GLS' Persistent Failure to Comply With the
Guaranteed Work Share Provision of the SAL Subcontract)**

53. As originally signed on December 21, 2007, the SAL Subcontract guaranteed SAL a work share of at least 4% of the services to be provided under the Prime Contract. At that

point, however, the parties were still negotiating an increase in the amount of SAL's guaranteed

work share. Then, in a February 11, 2008 email from Mr. Michael Shingledecker of GLS to Mr.

Tom Rosenbarger of SAL (attached as **Exhibit N**), Mr. Shingledecker explained that SAL's

work share would be increased to 15%.

> Steve Agrati and Bob Arsenault have discussed making changes in the work share
> between WWLR and SAL. The bottom line is that SAL's work share would
> increase to 15%.

"WWLR" stands for WorldWide Language Resources, an independent company owned by SAL

member Mr. Costa. At the time, WWLR also had a subcontract with GLS with a guaranteed

work share. When SAL's work share was increased, however, WWLR's was eliminated

altogether.

     54.    The increase in SAL's guaranteed "work share" to 15% referenced in Mr.

Shingledecker's February 11, 2008 email was reflected in Mod 2[6] to the SAL Subcontract, which

became effective February 18, 2008. As amended by Mod 2, the Guaranteed Work Share

Provision of the SAL Subcontract stated as follows: "The parties agree that GLS shall

subcontract 15% of the services to be provided under the prime contract, provided other

conditions and obligations identified herein are met." SAL met all of the contractual conditions

and obligations under the Subcontract, but it never received the 15% work share to which it was

entitled. GLS' compliance with the Guaranteed Work Share Provision—or in this case, its lack

thereof—was to be measured over the entire length of the SAL Subcontract. As the Guaranteed

Work Share Provision states, "fulfillment of this requirement shall be evaluated on the last day of

Subcontract performance." The last day of performance under the SAL Subcontract was in

2012.

---

[6] There was no Mod 1; rather, Mod 2 was the first modification to the SAL Subcontract.

55.     In a February 18, 2008 letter from Mr. Agrati of GLS to INSCOM (attached as **Exhibit O**), GLS sought the U.S. Army's permission to subcontract work under the Prime Contract to SAL.   Mr. Agrati's February 18, 2008 letter referenced the Small Business Subcontracting Program (FAR 19.701-708), stating as follows: "*Subsequent to submitting subcontractor's cost proposal for the January, 2008 Invitation for Discussion, an increase in work share was negotiated with this Alaskan Native Corporation, which is considered a small business for small business subcontracting reporting purposes per FAR 19.703(c)(1)(i). Attached hereto is a revised cost proposal.*" (emphasis in original).

56.     On March 14, 2008, Mr. Agrati sent Bob Arsenault, who had become SAL's President and CEO in November 2007, the email attached as **Exhibit P** to discuss the ramp-up and start of contractual performance.   In an effort to comfort Mr. Arsenault about the way GLS would conduct itself in their business relationship, Mr. Agrati's March 14, 2008 email stated: "I would never alter our deal with you without talking to you and seeking your concurrence."

57.     Thereafter, GLS presented SAL with a June 18, 2008 document entitled "Integrated Team Management Approach (ITMA) Implementation Plan (SAL)" (the "Implementation Plan").   Page 6 of the Implementation Plan described the way in GLS further promised to operate with respect to SAL:

> Within this extremely fast-paced and dynamic paradigm, the following ITMA Operating Principles will be applied and enforced at all levels: ...
>
> ⇒     Based on specific mission needs, subcontractors will be assigned and maintained at 100% of their previously agreed upon linguist compliment, to the greatest extent possible.
>
> ⇒     Shortfalls will be absorbed by GLS.
>
> ⇒     All ITMA resources, dollars and faces, are tied to revenue.  No ITMA resources will be provided until the affected team member is generating sufficient revenue to generate the required indirect dollars (G&A and Overhead) to meet their obligations.

22

58.     That same day, June 18, 2008, GLS provided SAL with a presentation created by Buzz Blizzard entitled "SAL Initial Walk-Through Session" a copy of which is attached as **Exhibit Q**. One slide of the June 18, 2008 presentation, entitled "ITMA[7] Allocation Computation Model," noted that SAL was allocated a "15.00% Work Share of $."

59.     For performance of GLS' obligations under the Prime Contract, GLS allotted specific linguist spots to its subcontractors. Specifically, GLS' Implementation Plan expected SAL to provide 3,944 local national "CAT I" linguists, and 276 US "CAT I" linguists, with a start date of September 19, 2008. Appendix G to the Implementation Plan, entitled "Team GLS ITMA 'SAL Implementation' Timeline" projected that by September 30, 2008, SAL would be at "Full Work Share."

60.     Soon after beginning work under the SAL Subcontract, SAL urged GLS to send work its way and to use its services in staffing linguists. For example, as early as April 7, 2008, Mr. Arsenault of SAL sent Mr. Agrati of GLS the email attached as **Exhibit R** for the purpose of discussing "work allocation."

61.     On October 3, 2008, on behalf of SAL, Sonny Achakzai sent Mr. Blizzard of GLS the email attached as part of **Exhibit S** to inquire about when GLS would allocate to SAL the number of linguists it had been expecting based on prior promises from GLS. Mr. Achakzai's October 3, 2008 stated: "I am ready to take on what ever [sic] you can give me. I need revenue." Mr. Blizzard's reply, also attached as part of **Exhibit S**, stated:

> We are well on the away to getting you about 3,000 LNs [local national linguists] as fast as we can get them signed over. Our ultimate goal within the next few days is to get you to the 80-90% mark of our original estimates. Plus Mo and the gang are continuing to fill out FSAs [foreign service agreements] as quickly as they can corral the linguists. Right now, SAL is our #1 priority!

---

[7] "ITMA" stands for "Integrated Team Management Approach," which was the management method used and specified in the SAL Subcontract and Prime Contract.

62.     Pursuant to the Implementation Plan, GLS sent SAL a series of communications entitled "ITMA Update."  The first such ITMA Update was sent on January 8, 2009 to Mr. Miller at SAL from Mr. Blizzard at GLS.  The January 8, 2009 ITMA Update tried to justify initial problems with doling out work but also explained how the measurement of "contract-based 'Work Share' dollars" would be used to track compliance with the Guaranteed Work Share Provision of the SAL Subcontract.  In this regard, the January 8, 2009 ITMA Update stated as follows: "please remember that the number of allocated linguists is only a management indicator to help GLS and you structure and manage your actual 'Work Share' dollars. SAL's 'Work Share' status will continue to be verified monthly based on your invoices. Those analyses will be driven by the total dollars 'billed' by you to GLS throughout a given month."

63.     Approximately a month after the date of the January 8, 2009 ITMA Update, on February 9, 2009, Mr. Shingledecker of GLS sent the email attached as **Exhibit T** to all ITMA subcontractors, including SAL.  Mr. Shingledecker's February 9, 2009 email requested that subcontractors submit "revenue recognition" Monthly Status Reports so that GLS could track "work share."  In this regard, the first paragraph of Mr. Shingledecker's February 9, 2009 email stated as follows:

> As you are no doubt aware, your subcontract contains language requiring your company to receive a certain percentage of the total value of the contract (work share). ***The number of linguists and fill rates are not relevant to the subcontract so long as GLS meets it [sic] obligation to provide your company with enough revenue to achieve the desired work share.***

(emphasis added).

64.     After receiving Mr. Shingledecker's February 9, 2009 email, SAL sent GLS regular status reports reflecting the revenue that SAL had received pursuant to the SAL Subcontract.  Similarly, pursuant to Article VIII of the SAL Subcontract, GLS was supposed to "provide a copy of the Subcontractor Allocation Matrix to Subcontractor on a monthly basis to

24

enable Subcontractor to determine GLS' compliance" with its work share obligations.   (FRE 1006 SAL Subcontract Summary at Article VIII [p. 9]).   Despite SAL's submission of such reports to GLS, for quite some time after receiving Mr. Shingledecker's February 9, 2009 email, SAL did not receive any reports from GLS showing GLS' revenue from the Prime Contract so that SAL could verify compliance with the Guaranteed Work Share Provision.   Nevertheless, SAL suspected—correctly—that the revenue it was receiving was well below the 15% share of GLS' total revenue under the Prime Contract to which it was contractually entitled.   SAL could not confirm its suspicions, however, without revenue information from GLS.

65.   On April 21, 2009, Mr. Mike Miller of SAL sent Mr. Shingledecker of GLS the email attached as **Exhibit U** requesting "a copy of the Revenue Recognition report with all the data so we can see the status of our percentage as you are tracking it."

66.   A few months later, GLS still had not provided the requested revenue information to SAL.   On July 2, 2009, SAL's President, Mr. Arsenault, sent Mr. Loiselle, SAI's President, the email attached as part of **Exhibit V**.  Mr. Arsenault's July 2, 2009 email stated:

> The fact is that GLS does not tell us what our share of the work is. ... It is fairly apparent that we are well below where we should be.  I base this on the fact that Steve [Agrati] has told me on at least a couple occasions that GLS is at over 100% fill.[8]

67.   As part of the same July 2, 2009 email thread attached as **Exhibit V**, Mr. Miller wrote to Mr. Arsenault, "I do not know the percentage of work we are at.  Only GLS knows that, because only they know the actual amount spent to date overall.  That is function of the 'GLS Use Only Box' on that report."

---

[8] "Fill" or "fill level" relates to the percentage of positions available to the prime contractor pursuant to the prime contract that are actually filled by employees – whether through subcontractors or otherwise.

4827-6380-2387.15

68.    After further requests from SAL to obtain information about the revenue that GLS had received from the Prime Contract, GLS finally started providing that information regularly in Monthly Status Reports by the fall of 2009. These Monthly Status Reports made clear that GLS was not providing SAL with sufficient work to attain the 15% share of total Prime Contract revenue to which SAL was contractually entitled under the Guaranteed Work Share Provision of the SAL Subcontract. This issue was the subject of much correspondence between SAL and GLS. GLS blamed work share issues on the troop drawdowns in Iraq and Afghanistan, and SAL tried to work with GLS to come up with solutions. On September 9, 2009, Mr. Arsenault sent Mr. Agrati the email attached as **Exhibit W** stating as follows: "SAL understands the reduction in workshare (but not percentage) as our forces begin to draw down. Please advise as to how S[AL] will achieve its 15% workshare overall as this occurs."

69.    On many occasions, SAL offered to fill other positions—such as Site Management positions in Iraq—so that it could obtain revenue closer to the 15% of total Prime Contract revenue to which it was entitled under the SAL Subcontract. Time after time, GLS denied such requests. Regardless of whether the contact with GLS was initiated by Mike Miller, Tom Rosenbarger, Ron Haynes, Sonny Achakzai, or Bob Arsenault, SAL's repeated offers to take on additional work in other roles were all—as stated in the February 10, 2010 email attached as **Exhibit X**—"politely rebuffed." Eventually, however, these rebuffs were no longer polite. Instead, GLS repudiated its obligations under the Guaranteed Work Share Provision altogether—thereby depriving SAL of the benefit of its bargain under the SAL Subcontract.

**(GLS' Procurement of the Successor Prime Contract)**

70.    During 2010 and 2011, GLS was in the process of gearing up to bid for the Successor Prime Contract, known as DLITE. At first, GLS expressed interest in subcontracting with SAL on DLITE. In late June and early July of 2010, GLS and SAL met to discuss a

26

potential teaming agreement related to the DLITE procurement. Such meetings are reflected in, for example, the June 25, 2010 email from Mr. Agrati attached as **Exhibit Y**. After initial meetings, however, it became clear to SAL that GLS would not team with SAL to pursue the DLITE opportunity. Instead, GLS was focusing on other subcontractors—including the Conspiring Subcontractor(s).

71.     On July 1, 2011, GLS was awarded the Successor Prime Contract. Soon thereafter, GLS repudiated its obligations to SAL under the Guaranteed Work Share Provision even though the SAL Subcontract remained in full force and effect.

### (GLS' Repudiation of the Guaranteed Work Share Provision)

72.     On July 14, 2011, various representatives of SAL and GLS met at GLS' Northern Virginia headquarters to discuss a number of issues, including compliance with the Guaranteed Work Share Provision. Those present at the July 14, 2011 meeting on behalf of SAL were Mr. Ken Cameron, Mr. Bob Arsenault, Mr. Mike Miller, and Mr. Jim Sims. Those present at the July 14, 2011 meeting on behalf of GLS were Mr. Michael Fink, Ms. Maria Ficocelli, and Mr. James Filibeck. After that meeting, SAL remained hopeful that GLS would henceforth comply with its obligations to SAL under the Guaranteed Work Share Provision of the SAL Subcontract. But instead, a few weeks later on August 12, 2011, Mr. Fink sent GLS' Repudiation of the Guaranteed Work Share Provision to SAL. (**Exhibit H**).

73.     GLS' Repudiation of the Guaranteed Work Share Provision claimed that "the current approach to work share measurement"—an "approach" that had been reflected in the Monthly Status Reports generated by GLS throughout the course of the parties' relationship—was in fact "inconsistent with our contract language." GLS' Repudiation of the Guaranteed Work Share Provision announced that it was implementing unilaterally what GLS called "a mid course adjustment" to its calculation of the percentage of the Prime Contract Revenues awarded

27

to SAL. As a result of this "mid course adjustment," GLS proceeded to calculate the percentage of Prime Contract revenues awarded to SAL through June 30, 2011 in a manner different from that reflected in any prior Monthly Status Report. A copy of "GLS' Adjusted Status Report" is attached as **Exhibit H**.

74.     Besides being inconsistent with the plain language of the Guaranteed Work Share Provision, GLS' unilateral "mid course adjustment" was also inconsistent with the way that GLS had previously represented that subcontractor participation rates would be determined and used when GLS was soliciting the Prime Contract from the U.S. Army. As admitted by GLS' former General Manager, John W. Houck, GLS' goal was to maximize its potential evaluation score by providing small business subcontractors with a 35% work share. (Ex. B at 2). At that time, it was clear to the U.S. Army, the Wartime Commission, GLS, and its subcontractors that this small business participation and work share percentage was based on a percentage of the total contract revenue. By changing its calculation methodology, GLS essentially broke its promises to the U.S. Army that it made during the Prime Contract solicitation process.

75.     GLS' "mid course adjustment" had the effect of improperly inflating GLS' calculation of the percentage of the Prime Contract awarded to SAL. Even with this "midcourse adjustment," however, GLS' Adjusted Status Report showed an "Allocation %" of only 13.59%—still below the 15% to which SAL was entitled by virtue of the Guaranteed Work Share Provision. GLS' Repudiation of the Guaranteed Work Share Provision acknowledged this deficiency and claimed that "[p]rojections through the end of December [2011] reflect work shares that will exceed 15%." Regardless of what GLS' alleged projections showed at the time, SAL never received the 15% of total Prime Contract revenues to which it was contractually entitled pursuant to the proper allocation methodology. In fact, SAL never even received 15% of

28

the total linguist portion of the revenue that GLS used in its newly announced improper allocation methodology.

76.     Pursuant to its "mid course adjustment," GLS reduced the denominator by changing it from the total revenue received under the Prime Contract to just the revenue received from linguists used on the Prime Contract. While reducing the denominator arbitrarily, GLS kept the numerator—the revenue that SAL received from the work actually given to SAL— constant. Thus, by using a different allocation methodology than the one specified in the SAL Subcontract and the Prime Contract, GLS artificially inflated its calculation of the work share received by SAL.[9]

77.     On August 16, 2011, in response to GLS' Repudiation of the Guaranteed Work Share Provision, Mr. Arsenault sent Mr. Fink the correspondence attached as **Exhibit Z**. Mr. Arsenault's August 16, 2011 correspondence stated as follows:

> GLS has decided to interpret the INSCOM Iraq subcontract to Shee Atika Languages, LLC (SAL) in a manner inconsistent with the clear intent of the documents and the course of dealing between the parties. ... At no time has the interpretation of the subcontract been raised as an issue. SAL is entitled to 15% of the services under the prime contract as the subcontract clearly states. For over three years the subcontract has been interpreted correctly (GLS has provided its own computations based on 15% of the services under the prime contract) and GLS has consistently fallen short of the percentage to which SAL is entitled.

78.     After Mr. Arsenault sent the foregoing August 16, 2011 correspondence, SAL continued to perform its obligations under the SAL Subcontract in good faith while continuing to try to persuade GLS to reconsider its Repudiation of the Guaranteed Work Share Provision. For example, SAL met with GLS on September 22, 2011 to try to resolve the parties' dispute regarding GLS' newfound interpretation of the Guaranteed Work Share Provision and its refusal

---

[9] *See* FRE 1006 SAL Subcontract Summary at <u>Preamble</u> & <u>Article VIII</u> [pp. 1, 9] (work share is supposed to be calculated as a percentage of total revenue received under the Prime Contract, not just revenue attributable to linguist work).

to provide reports necessary to calculate the work share that SAL was receiving.  Such efforts

were unavailing.

79.     SAL's unsuccessful efforts to resolve the parties' dispute regarding the

Guaranteed Work Share Provision were reflected in, *inter alia*, the January 16, 2012

correspondence attached as **Exhibit AA**.  In this regard, SAL's January 16, 2012 correspondence

stated in part as follows:

> GLS has now stopped providing SAL with workshare computations.  Prior to
> August, 2011, both SAL and GLS interpreted the SAL subcontract as obligating
> GLS to provide SAL with workshare equal to 15% of the total contract value.
> Consistent with this mutual understanding, GLS routinely provided SAL with
> ongoing reports as to GLS' progress towards meeting this requirement.  However,
> in August, 2011 GLS informed SAL that GLS was abruptly changing his
> interpretation so that SAL's workshare would be computed as being limited to
> 15% of the linguist value.  Furthermore, GLS unilaterally discontinued providing
> SAL with reporting regarding its progress in satisfying the workshare
> requirement.  SAL objected to this change, and a meeting to try to resolve the
> workshare issues took place with you on September 22, 2011.

SAL's January 16, 2012 correspondence also represented yet another unsuccessful attempt to

resolve the parties' dispute regarding GLS' breaches of its obligations to pay SAL's invoices.

These breaches are discussed in more detail below.

### (GLS' Breaches of its Obligations to Pay SAL's Invoices)

80.     The SAL Subcontract obligated GLS to reimburse SAL for its costs so long as

they were "allowable" and did not exceed the contract ceiling.  In addition, the Prompt Payment

Provision of the SAL Subcontract obligated GLS to remit payment of SAL's invoices no later

than 60 days from GLS' receipt of an acceptable SAL invoice—even if the U.S. Army had not

yet paid GLS.  Specifically, the Prompt Payment Provision stated that "GLS will remit payment

to Subcontractor within ten (10) business days of receipt of payment to GLS for Subcontractor's

services by the Client [the U.S. Army] but such payment shall not exceed 60 days from receipt of

an acceptable Subcontractor invoice."   In other words, the 60-day payment deadline was

triggered only if GLS had not been paid for services performed by SAL. The Prompt Payment Provision specifically anticipated the possibility of that situation occurring. Otherwise, GLS was obligated to remit payment to SAL within 10 days of receiving payment from the U.S. Army.

81.    The same Article of the SAL Subcontract, Article XIV, also contained a "Prompt Invoice Review Provision." The Prompt Invoice Review Provision required GLS to make a decision about the acceptability of an invoice from SAL within 5 calendar days of its submission. Specifically, the SAL Subcontract stated as follows:

> *GLS agrees to review Subcontractor's invoices promptly upon submission.* Unless GLS notifies Subcontractor of a discrepancy within *five (5) calendar days* of GLS's receipt of such invoice, Subcontractor shall submit the invoice to Accounts Payable at the following address:
>
> > Global Linguist Solutions, LLC
> > Attn: Accounts Payable
> > P.O. Box 961217
> > Fort Worth, TX 76161-1217
>
> *The invoice shall be deemed acceptable and GLS shall pay Subcontractor within the time period set forth [in the Prompt Payment Provision] regardless of whether GLS subsequently discovers a discrepancy with such invoice.* GLS and Subcontractor each agree to work cooperatively with the other to correct any discrepancy.

(FRE 1006 SAL Subcontract Summary § Article XIV [p. 13]) (emphasis added).

82.    Notwithstanding the Prompt Payment and Prompt Invoice Review Provisions of the SAL Subcontract, invoices that were deemed to be acceptable to GLS pursuant to the SAL Subcontract were not paid to SAL within 60 days of receipt. Instead, GLS withheld payments to SAL totaling $5,373,289. GLS' purported justification for the withholding was that a review performed by the DCAA had questioned certain charges by GLS (that were in turn related to SAL charges to GLS) in the aggregate amount of $5,373,289 and withheld payment to GLS of those charges pending submission of an explanation.

31

83.     By way of background, in May 2010, GLS had received a "Form 1" from the DCAA stating that payment to GLS of $5,373,289 related to work performed by SAL would be suspended.  GLS had already paid SAL the amount in question.  Upon GLS' receipt of the Form 1, GLS and SAL immediately began to work together to resolve the matter with DCAA. SAL hired Darrell Oyer, one of the country's leading experts on government cost accounting and allowability matters.  Working in conjunction with GLS, Mr. Oyer addressed each identified item in the DCAA Form 1.   Thereafter SAL agreed to an adjustment of approximately $1,359,696 and remitted payment to GLS in the form of a credit—leaving a balance of $4,048,284.

84.     On June 30, 2010, SAL, GLS, and the DCAA met in Fort Worth, Texas.  At this meeting, SAL and GLS presented the DCAA with a joint SAL-GLS explanation of why the $4,048,284 should be removed from suspended status and paid by the U.S. Army to GLS under the Prime Contract.  Notwithstanding this prior submission to the DCAA, shortly thereafter, GLS unilaterally withheld payment from SAL of approximately $1.6 million due under unrelated invoices dated May and June 2010.  SAL disputed the correctness of that action by GL, and so informed GLS.  At that point, however, SAL thought that GLS was working with DCAA to secure payment from the U.S. Army of the entire $4,048,284 that the parties had jointly submitted.  Only later did SAL learn that its trust in its business partner, GLS, had been misplaced.

85.     On April 6, 2011, Mr. Fink of GLS sent Mr. Arsenault and others at SAL the email attached as **Exhibit BB** regarding GLS' withholding of additional money from SAL in contravention of the terms of the SAL Subcontract.  In his April 6, 2011 email, Mr. Fink wrote as follows:

At that time back in June 2010, it was anticipated that resolution of the FORM 1 would be prompt and GLS would not need to withhold any further amounts. Unfortunately, this process has been extended to 9 months with no visible near term end in sight.  Given the long delay in resolution, it has been directed by the GLS Executive Committee of the Board to proceed with withholding of the balance of the FORM 1 value. Therefore, please be advised that GLS will be acting on this direction and will be withholding the FORM 1 balance of $2,356,834 from  your next few invoices.

86.     Then, on January 12, 2012, GLS withheld payment on unrelated invoices in the aggregate amount of $2,430,964 (in addition to the roughly $1.6 million that GLS had previously withheld).  As of January 12, 2012, GLS had thus withheld from SAL the entire $4,048,284 remaining at issue. On January 16, 2012, Mr. Arsenault of SAL sent Ms. Robbie Comer of GLS the correspondence attached as **Exhibit AA**. Mr. Arsenault's January 16, 2012 email disputed this withholding and explained SAL's position related to the withheld amounts. The parties also met in person to discuss the issue but were unable to resolve their differences.

87.     GLS' position was incorrect because *no* provision of the SAL Subcontract required SAL to provide additional explanation of its invoices after GLS had deemed them to be acceptable.     Nevertheless, Mr. Oyer's presentation provided additional explanation and substantiation of the costs at issue.

88.     After GLS persisted in its refusal to pay the invoices in question, on March 28, 2012, SAL submitted a "Certified Claim."  (**Exhibit I**).  SAL's Certified Claim demanded payment from GLS and provided additional substantiation for at least $3,717,522 of the costs at issue (the "Unrefuted Costs").  To this day, GLS *still* has not remitted payment for these Unrefuted Costs—all of which are allowable.

### (GLS' Breach of the Award Fee Provision)

89.     The Award Fee Provision stated as follows: "The Subcontractor will normally receive the same Award Fee as the Prime Contractor unless the Subcontractor presents strong

and completing [sic] justification as to why they [sic] should receive a higher award fee than the rest of the GLS team." (FRE 1006 SAL Subcontract Summary at Exhibit C (Statement of Work), § 5.0 [p. 85]).

90.     SAL is entitled to a minimum proportionate share of the total award fee paid by the U.S. Army to GLS. SAL's share of the award fee is defined by the Guaranteed Work Share Provision of the SAL Subcontract, *i.e.*, 15% of the total revenues to GLS under the Prime Contract.

91.     GLS has earned award fees on the Prime Contract, and apparently it has disbursed portions of the award fees to other subcontractors. GLS has not disbursed *any* share of its award fees to SAL, however.

**(Dissolution of SAL and Formation of the Trust)**

92.     SAL has been dissolved in accordance with Alaska Statutes (A.S.) 10.50.400.

93.     SAL filed Articles of Dissolution with the State of Alaska on June 21, 2012, with an effective date of February 6, 2013.

94.     SAL is in the process of winding up its affairs and is no longer in business.

95.     On February 4, 2013, SAL entered into the Trust Agreement attached as **Exhibit CC** with Mr. Cameron, Ms. Steffes, and Mr. Costa (collectively, the "Trustees") for the benefit of SAI and Mr. Costa as beneficiaries (the "Trust Beneficiaries") in proportion to their ownership of SAL.

96.     The Trust Agreement states that the exclusive purpose for which the Trust was organized is the liquidation of certain assets of SAL. These assets include the conduct and management of pending and/or threatened litigation ("Litigation") involving the "Trust Assets," as defined by the Trust Agreement.

97.     Exhibit A to the Trust Agreement is an Assignment of Claims by and through which SAL irrevocably sold, transferred, and assigned to the Trustees "all present and future settlements, claims, claims for damages, choses in action, causes of action, actions, and lawsuits, in law or in equity, and other rights of any nature, whether in contract or in tort that Assignor has or may have against any and all persons, individuals and entities (whether private or governmental) relating to, in connection with, or arising at any time out of the Assignor's business operations (collectively, 'Claims' and singly, a 'Claim')."

98.     The Claims to which the Trust Agreement applies specifically include those pertaining to or stemming from the SAL Subcontract. The Trust Agreement defines these Claims as "Trust Assets."

## COUNT I

### (Breach of Contract)

99.     The Shee Atiká Plaintiffs hereby incorporate by reference the foregoing paragraphs 1 through 98.

100.    The foregoing allegations establish the existence of an enforceable contract between SAL and GLS.

101.    The foregoing allegations establish that Defendant GLS has breached its contractual obligations to SAL.

102.    The foregoing breaches of contract on the part of Defendant GLS have caused The Shee Atiká Plaintiffs to suffer damages in an amount to be calculated at trial.

## COUNT II

### (Unjust Enrichment)

103.    The Shee Atiká Plaintiffs hereby incorporate by reference the foregoing paragraphs 1 through 102.

35

104.    Defendant GLS was unjustly enriched as a result of its receipt of a benefit from The Shee Atiká Plaintiffs and an inequity resulted to The Shee Atiká Plaintiffs due to GLS' retention of the benefit.

105.    Defendant GLS improperly obtained, accepted, and retained benefits by entering into the Prime Contract using SAL's name and reputation to successfully win the bid.  These benefits include retaining funds owed to The Shee Atiká Plaintiffs, continuing to trade upon the name and goodwill of The Shee Atiká Plaintiffs without permission, and other competitive benefits associated with winning a large prime contract with the U.S. Army.  Notwithstanding its receipt of such benefits, Defendant GLS continues to disregard The Shee Atiká Plaintiffs' rights and expectancies under the SAL Subcontract.

106.    Defendant GLS has full knowledge of The Shee Atiká Plaintiffs' rights and expectancies under the SAL Subcontract and retained money from The Shee Atiká Plaintiffs after knowingly breaching the SAL Subcontract.

107.    As a consequence of its actions, Defendant GLS was unjustly enriched at the expense of The Shee Atiká Plaintiffs.  Allowing Defendant GLS to retain its illegally-acquired benefits and interest under such circumstances would be inequitable and contrary to law.

## COUNT III

### (Virginia Business Conspiracy Statute)

108.    The Shee Atiká Plaintiffs hereby incorporate by reference the foregoing paragraphs 1 through 107.

109.    By engaging in the conduct described in the foregoing paragraph 108, Defendant GLS and the Conspiring Subcontractor(s) combined, associated, agreed, mutually undertook, or concerted together within the meaning of Va. Code § 18.2-499(A).

4827-6380-2387.15

110.   The concerted action of Defendant GLS and the Conspiring Subcontractor(s) described in the foregoing paragraph 109:

a.   was undertaken to injure The Shee Atiká Plaintiffs intentionally, purposefully, and without lawful justification;

b.   has in fact caused The Shee Atiká Plaintiffs to suffer injury to their business and reputation; and

c.   violated Va. Code § 18.2-499(A)—thereby entitling The Shee Atiká Plaintiffs to compensatory damages (including lost profits), treble damages, and costs and attorneys' fees pursuant to Va. Code § 18.2-500(A).

## PRAYER FOR RELIEF

WHEREFORE, The Shee Atiká Plaintiffs therefore seek the following:

a.   compensatory damages from GLS for breach of the Guaranteed Work Share Provision, the Prompt Payment Provision, the Award Fee Provision, and other provisions of the SAL Subcontract;

b.   to the extent that SAL has conferred benefits on GLS beyond those required by the SAL Subcontract, compensatory damages for unjust enrichment;

c.   an accounting of all revenues and credits received by GLS pursuant to the Prime Contract and the Successor Prime Contract, including award fees and refunds under the Indian Incentive Program;

d.   an accounting of the disbursement of such revenues (including award fees) to SAL, to other GLS subcontractors—including the Conspiring Subcontractor(s), and to the LLC members of GLS (DynCorp and AECOM);

e.   for the benefit of The Shee Atiká Plaintiffs, imposition of a constructive trust with respect to such revenues against GLS and the following additional persons or

4827-6380-2387.15

entities against whom injunctive relief is expressly authorized by Fed. R. Civ. P. 65(d)(2): GLS' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with GLS and its officers, agents, servants, employees, and attorneys—including the Conspiring Subcontractor(s) and the LLC members of GLS (DynCorp and AECOM);

f.    treble damages, costs, and attorneys' fees for violation of the Virginia Business Conspiracy Statute, Va. Code §§ 18.2-499 and 18.2-500; and

g.    such further relief as this Court deems just and proper.

Date: July 12, 2013                          Respectfully submitted,

By: _____
Michael J. Lockerby (VSB No. 24003)
Brian J. Kapatkin (VSB No. 73061)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W. Suite 600
Washington, D.C. 20007-5109
(202) 945-6079 (Telephone)
(202) 672-5399 (Facsimile)

George W. Ash (*pro hac vice* application pending)
FOLEY & LARDNER LLP
One Detroit Center
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226-3489
(313) 234-7100 (Telephone)
(313) 234-2800 (Facsimile)

*Counsel for The Shee Atiká Plaintiffs*

38