IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SHEE ATIKA LANGUAGES, LLC, <u>et</u> )
  <u>al.</u>,                          )
                                 )
        Plaintiffs,      )
                                 )     1:13cv00850 (LMB/TRJ)
   v.                        )
                                 )
GLOBAL LINGUIST SOLUTIONS, LLC, )
                                 )
        Defendant.      )

MEMORANDUM OPINION

Before the Court are the parties' motions for summary judgment. Plaintiffs Shee Atika Languages, LLC, ("Shee Atika") and The Shee Atika Languages, LLC, Liquidating Trust (collectively "plaintiffs" or "SAL") move for summary judgment on Count I of their Complaint, which alleges that defendant Global Linguist Solutions, LLC, ("defendant" or "GLS") breached the work share, prompt payment, and award fee provisions of the parties' subcontract.

SAL seeks approximately $25 million in damages on its breach of contract claim, specifically alleging that it is owed at least $3,799,572.00 under the subcontract's work share provision; $3,717,522.00 under the prompt payment provision; and $17,707,813.09 under the award fee provision.

GLS, in turn, moves for summary judgment on Counts I and II of SAL's Complaint. Count II alleges that GLS was unjustly

enriched by Shee Atika's involvement with GLS's prime contract with the United States Army.[1]  For the reasons that follow, SAL's motion for summary judgment will be denied, GLS's motion for summary judgment will be granted, and judgment will be entered in GLS's favor.

I.   BACKGROUND

Shee Atika was a majority-owned and controlled subsidiary of a "Native Corporation" under the Alaska Native Claims Settlement Act and a provider of interpreter and translation services.  Compl. ¶ 6.  Shee Atika teamed with GLS in August 2007 to bid on United States Government Prime Contract No. W911W4-08-D-0002 (the "Prime Contract").  Id. ¶ 1, n.2.  The Prime Contract was a cost plus fixed fee, indefinite delivery/indefinite quantity ("ID/IQ") contract under which the Army's Intelligence and Security Command ("INSCOM") ordered work from GLS.  Dkt. No. 58 at 3-15 (GLS's Statement of Undisputed Material Facts ("DSUMF")), ¶ 5.

On December 21, 2007, shortly after INSCOM awarded GLS the Prime Contract, GLS and Shee Atika entered into the subcontract at issue in this litigation (the "Subcontract").  Compl. Ex. A; Dkt. No. 53 at 4-13 (Plaintiffs' Statement of Undisputed

---

[1] SAL's claim under the Virginia Business Conspiracy Statute (Count III) was dismissed with prejudice in September 2013.

2

Material Facts ("PSUMF")), ¶ 1; DSUMF ¶¶ 3, 7.  Article II of the Subcontract provides for termination of the agreement on December 5, 2012; however, Article XIII further provides that the Subcontract "shall extend through the entire term of the [P]rime [C]ontract" and that Shee Atika agrees "to continue performance of work under this Subcontract for the option periods and any other Subcontract extensions pursuant to the same terms and conditions of this Subcontract."

It is undisputed that INSCOM extended the term of the Prime Contract with GLS through July 3, 2013.  Affidavit of Robin Peters ("Peters Aff.") ¶ 15 ("INSCOM exercised all options years under the Prime Contract and extended the services of the Prime Contract.  GLS'[s] performance under the Prime Contract ended on July 3, 2013."); Deposition of Shee Atika's Fed. R. Civ. P. 30(b)(6) Designee Robert L. Arsenault ("Arsenault Dep.") at 64-65; 135.

The Subcontract was a "Cost Plus Fixed Fee (CPFF), Level-of-Effort, Indefinite Delivery, Indefinite Quantity (IDIQ) contract with a fixed fee not to exceed 5.75% of total estimated costs." Art. IX.[2]  The total value of all orders placed under the Subcontract was capped at $696,750,000, and the minimum value of the Subcontract was $100.  Id.

---

[2] The Articles of the Subcontract are cited as "Art. __."

3

Under what the parties refer to as the "work share" provision of the Subcontract, GLS agreed "to provide 15% of the services to be provided under the Prime Contract" to Shee Atika; however, whether this requirement was met would be determined at the conclusion of the Subcontract.  Art. VIII.

The Subcontract further provides that Shee Atika's 15% work share "will consist of services provided by C[ategory] I Local Nationals employed by [Shee Atika]," and that "[i]n no event shall [Shee Atika] be required to employ C[ategory] II or C[ategory] III personnel."  Id.  The three categories of linguist personnel are defined in Section 2.2 of the Statement of Work/Task Order Requirements ("Statement of Work"), attached as Exhibit C to the Subcontract.[3]

Beginning in June 2008, following modification by the parties, the Subcontract required GLS to provide monthly status reports regarding Shee Atika and the other subcontractors' work shares under their respective subcontracts, as well as GLS's total revenue under the Prime Contract.  It is undisputed that

---

[3] Category I and II linguists are required to have native proficiency in specified, required languages and working proficiency in English, while Category III linguists must have professional working proficiency in both the required languages and English.  Category I linguists may be hired locally (that is, in a foreign country), while Category II and III linguists must be United States citizens.  Category I linguists do not require a security clearance; however, Category II linguists must have "interim" security access, and Category III linguists must possess a security clearance.

4

GLS did not provide Shee Atika with regular status reports until the fall of 2009, after Shee Atika repeatedly asked for them. It is also undisputed that each status report GLS provided to Shee Atika showed that the work assigned to Shee Atika represented less than 15% of GLS's total revenue under the Prime Contract.  PSUMF ¶¶ 8-11.

On August 12, 2011, GLS sent Shee Atika a letter claiming that GLS's previous approach to calculating work share – as a percentage of GLS's total revenue under the Prime Contract – was inconsistent with the language of the Subcontract.  Accordingly, that letter accompanied an adjusted status report (the last sent by GLS to Shee Atika), which calculated Shee Atika's work share as a percentage of GLS's revenue associated with linguist services that GLS provided to INSCOM under the Prime Contract, rather than all services GLS provided under the Prime Contract. Shee Atika protested GLS's adjustment to the work share calculation, but continued to perform under the Subcontract. PSUMF ¶¶ 13-21.

Shee Atika dissolved in January 2012, assigning its right to assert any claims against GLS to The Shee Atika Languages, LLC, Liquidating Trust.  Compl. ¶ 20; Dkt. No. 58 Attach. E (Articles of Dissolution).  After its dissolution, Shee Atika continued to perform under the Subcontract; however, by June

2012 it stopped taking any further work orders, prematurely

abandoning the Subcontract.  According to uncontested evidence

from Adam Suiter, GLS's Chief Financial Officer, as of June

2012, when Shee Atika abandoned the Subcontract, it had received

work share equal to 13.27% of all revenue under the Prime

Contract and 15.64% of all revenue for linguist services.  Dkt.

No. 58 Attach. F (Affidavit of Adam Suiter) ("Suiter Aff."), ¶

4.

On May 18, 2010, the Defense Contract Auditing Agency

("DCAA") questioned $5,373,289 of the Shee Atika invoices that

GLS had already paid.  As a result of DCAA's concerns, the Army

withheld that amount from payments to GLS.  Consequently, and

over Shee Atika's objection, GLS withheld $5,373,289 from

payments to Shee Atika on invoices unrelated to the costs

questioned by DCAA.  PSUMF ¶¶ 28, 29, 36, 37; DSUMF ¶¶ 50, 51.

On March 28, 2012, recognizing that not all of its

previously submitted claims were allowable, Shee Atika submitted

a certified claim to GLS for submission to DCAA that purported

to substantiate $3,717,522 of the $5,373,289 in costs questioned

by DCAA.  Shee Atika demanded that GLS reimburse Shee Atika for

that $3,717,522, but also issued GLS a "credit" against its

outstanding payment request, the difference between the amount

questioned by DCAA and withheld from GLS by the Army, and the

6

amount Shee Atika purported to substantiate in its certified claim.   PSUMF ¶¶ 32-34 ("Consistent with its Certified Claim, [Shee Atika] issued GLS a credit against outstanding payment requests of at least $1,325,008.40."); but see DSUMF ¶¶ 57, 58 ("[Shee Atika] concurred with parts of DCAA's audit findings, including agreeing that $1.6 [million] of the DCAA questioned costs were unallowable, excluding them from [its] claim.").

GLS sought clarification of Shee Atika's claim and requested additional supporting documentation, but Shee Atika failed to respond to GLS's requests for that information.   DSUMF ¶¶ 61-63.   For example, in his deposition, Shee Atika's Fed. R. Civ. P. 30(b)(6) Designee Darrell J. Oyer admitted that a "break out" of $1,928,566 included in the certified claim was not included in the claim documentation and that Shee Atika did not respond to GLS's requests for more information regarding the certified claim.   Dkt. No. 58 Attach. D (Deposition of Shee Atika's Fed. R. Civ. P. 30(b)(6) Designee Darrell J. Oyer ("Oyer Dep.")) at 149-51, 154.   Oyer also stated that it was his belief that not all of the supporting documentation needed to be submitted and that it was "quite common, because of the voluminous data, that you send the most pertinent items, but the others have to be available on an audit."   Id. at 236-37. Nevertheless, SAL argues that "GLS had sufficient information

and documentation to validly submit the [c]ertified [c]laim to
DCAA." Dkt. No. 67 at 13, 27-28. It is undisputed that as a
result of GLS never submitting Shee Atika's claim to the Army,
GLS never rescinded its decision to withhold $3,717,522 for the
disallowed costs.

Under the Prime Contract, GLS was elibigle for award fees
if it achieved certain goals during performance. GLS received
$118,052,087.24 in award fees, and although some subcontractors
received a portion of those award fees, Shee Atika did not.
PSUMF ¶¶ 23-24.

## II.   DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when the record shows that
"there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). The moving party bears the initial burden of
"pointing out to the district court [] that there is an absence
of evidence supporting the nonmoving party's case," after which
the nonmoving party must "go beyond the pleadings" and present
specific facts to establish a genuine issue for trial. Celotex
Corp. v. Catrett, 477 U.S. 317, 324-25 (1986). In going beyond
the pleadings, "the non-moving party may not rely upon mere
allegations" and "his response must, with affidavits or other
verified evidence, set forth specific facts showing that there

is a genuine issue for trial." Graham v. Geneva Enters., 55 F. App'x 135, 136 (4th Cir. 2003) (per curiam).

Although the court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks omitted).

### B. Cross-Motions for Summary Judgment on Count I (Breach of Contract)

#### 1. Work Share Provision

The Preamble to the Subcontract provides that "[t]he parties agree that GLS shall subcontract 15% of the services to be provided under the prime contract, provided other conditions and obligations identified herein are met." Under Article VIII, entitled "Performance," the Subcontract further provides that

> [a]s detailed in the preamble to this Subcontract, GLS agrees to provide 15% of the services to be provided under the Prime Contract to Subcontractor provided other conditions and obligations indentified [sic] herein are met.  The fulfillment of this requirement shall be evaluated on the last day of Subcontract

9

performance.   In   no   event   shall   Subcontractor   be
required to employ CAT II or CAT III personnel.

SAL's first breach of contract claim alleges that GLS
breached its obligations to provide Shee Atika with that 15%
work share.  SAL's primary argument is that in 2010 and 2011,
GLS recognized that SAL was not getting 15% of the work, and
that rather than providing more work, GLS improperly changed its
course of conduct in 2011, which had been to measure the 15% as
a portion of GLS's total work under the Prime Contract.
Instead, GLS switched to measuring the 15% as a portion of just
the linguist services GLS was providing under the Prime
Contract.  SAL refers to the August 2011 letter announcing this
change as a "repudiation" of the parties' work share agreement.
Dkt. No. 53 at 17-21; Dkt. No. 67 at 16-20.

SAL also maintains that Shee Atika was both willing and
able to continue performing under the Subcontract even after its
dissolution in early 2012; however, Shee Atika was not required
to take unprofitable work from Category II and III linguists,
though it could do so under the permissive language of the
Subcontract.  Dkt. No. 67 at 19.

GLS counters SAL's argument by denying that it repudiated
the 15% work share agreement in August 2011, pointing out that
the previous approach to calculating the work share was not

10

consistent with the Subcontract.  GLS goes on to argue that the uncontested evidence shows that after August 2011, Shee Atika's work share – regardless of whether it was based on total revenue or linguist services – increased and, in its strongest argument, maintains that Shee Atika cannot show that the 15% work share was not met because Shee Atika abandoned the Subcontract prematurely when it refused to take on new work in June 2012. Dk. No. 58 at 15-16; see also Arsenault Dep. at 115 (agreeing that work share was measured at the end of the Subcontract), Dkt. No. 67 at Ex. 25 (SAL's Analysis of Shee Atika Workshare) (marked "Plaintiffs' Exhibit 128") (indicating that for each month between August 2011 and June 2012, Shee Atika was receiving 12-13% of total Prime Contract revenue and 15-16% of linguist services revenue).

Finally, GLS argues that the 15% work share provision was always intended to be based on the revenue GLS received for linguist services, and not based on its total revenue, pointing out that the Subcontract defines "services" as "all services, labor, material and actions necessary for the performance of [the Subcontract]," and that the services necessary for the performance of the Subcontract were exclusively linguist services.  Id. at 17-18; Art. I(B).  GLS goes on to state that "[t]he only reasonable interpretation of the workshare [sic]

11

provision in a contract exclusively for linguist services is
that it is limited to linguist services."  Id. at 18.

There is some evidence to support SAL's position that both
the language in the Subcontract as well as GLS's course of
performance mean that it was entitled to 15% of the total
revenue GLS received under the Prime Contract.  The language of
the Subcontract is at times general and imprecise, and after
Shee Atika demanded that GLS provide monthly status reports
regarding work share, those reports reflected the work share
Shee Atika was receiving based on the total revenue GLS was
receiving from its work under the Prime Contract.  SAL points to
those monthly status reports as course of performance evidencing
that GLS understood the work share to be based on total revenue.

There is also some merit to GLS's argument that given the
clear understanding of the parties that Shee Atika's role in the
Subcontract was solely to provide linguist and interpretation-
related services, Shee Atika's expectation to receive 15% of all
the services GLS provided the Army under the Prime Contract was
unreasonable.

Ultimately, the Court does not need to decide which view of
the work share provision is correct to resolve SAL's breach of
contract claim because Article VIII makes clear that GLS's
obligation to provide Shee Atika with 15% of the services to be

12

provided under the Prime Contract was contingent upon other conditions and obligations being met and that "[t]he fulfillment of this requirement shall be evaluated on the last day of Subcontract performance." That day never came owing to Shee Atika's breach of the Subcontract by declining to take on any new work as of June 2012.

SAL attempts to excuse its failure to perform through the end of the Subcontract[4] by arguing that much of the work GLS was offering involved the use of Category II or III linguists, which were less profitable for Shee Atika, in violation of the Subcontract provision that did not require Shee Atika to use such linguists. This argument fails for three reasons. First, the record shows that Shee Atika chose to accept work orders requiring large numbers of Category II and III linguists during the course of its performance under the Subcontract and that it received over $27,000,000 in revenue for work performed by them under a single task order between June 2010 and August 2011.

---

[4] The parties dispute the termination date of the Subcontract. SAL argues that the Subcontract ended on December 5, 2012. Dkt. No. 53 at 2; Dkt. No. 67 at 10, 13; PSUMF ¶ 1. GLS argues that the Subcontract ended on July 3, 2013, after the Army exercised its option to extend the term of the Prime Contract. Dkt. No. 58 at 4-6, 15-16. Ultimately, the parties' dispute is immaterial because each alleges that the other breached the Subcontract before December 2012, the earlier of the two purported termination dates: SAL argues that GLS breached the Subcontract in August 2011 by changing the way it measured the 15% work share, while GLS argues that SAL breached the Subcontract in June 2012 when it stopped taking new work.

See Dkt. No. 53 at 21 n.17 (stating that "for a time," Shee Atika did use Category II and III personnel); DSUMF ¶¶ 22-26; Dkt. No. 58 at 16-17.   Second, there is no evidence in the record that Shee Atika ever complained about having to use Category II or III linguists.

Finally, and most importantly, GLS cites several June 2012 e-mails from Shee Atika to GLS, which demonstrate that Shee Atika was not refusing work because of the category of linguists involved, but because Shee Atika was winding down its work as a result of its dissolution earlier that year.   See DSUMF ¶¶ 31-36; see also Peters Aff. Ex. H (June 12, 2012, e-mail from Shee Atika's representative Jim Sims to GLS stating that he had "been instructed . . . not [to] pursue additional work" under one task order, "need[ed] to initiate the migration of [] linguists back to GLS or other Subcontractors as directed," and that he had also been "advised not to continue work" under another task order), Ex. I (June 15, 2012, e-mail from Sims stating that Shee Atika "will not seek to pursue any work beyond our current Task Order end dates" given the decision by Shee Atika's ownership to dissolve), Ex. J (June 20, 2012, e-mail from Sims stating that "I've been told not to sign anything new"), Ex. K (June 21, 2012, e-mail from Sims stating that "I['] ve been told directly not to incur any work beyond the POP for each task order").

14

In arguing that Shee Atika's dissolution had nothing
whatever to do with its decision to refuse work, SAL cites e-
mails from January and February 2012 - shortly after Shee Atika
dissolved - demonstrating only that at that time, it had every
intention of honoring its obligations under the Subcontract.
See Dkt. No. 67 at 9 n.12, Exs. 17-20; Peters Aff. Ex. G
(January, 2012, e-mail from Kenneth Cameron stating that Shee
Atika "assure[s] you that although [Shee Atika] will not be able
to sign any further contracts, modification[s,] or extensions,
[Shee Atika] fully intends to honor its existing commitments and
resolve all outstanding disputes").

Whatever Shee Atika's intentions in early 2012, the
undisputed evidence demonstrates that by June of that year it
was refusing work under the Subcontract because of its
ownership's decision to dissolve the company, not because of the
type of linguists who would perform the work.  For this reason
alone, it is not material whether GLS offered Category II or III
linguist work or whether Shee Atika took that work (either out
of an obligation or simply because it could).

The record is replete with evidence - on which SAL heavily
relies - that beginning in June of 2010, GLS realized that it
might be difficult, if not impossible, to fulfill its work share
obligations to SAL by the end of the Subcontract.  On June 16,

15

2010, GLS executive Stephen Agrati wrote to John Houk, another
GLS executive, stating that GLS had "a contractually binding
obligation to subcontract 15% of the current prime contract
revenue to SAL," that "[a]s of the end of May, we have achieved
8.3%," and that "[b]y the[] end of December, 2010, we expect to
achieve 9.33%."  Agrati speculated that "[i]t is unlikely that
we will get SAL above 10% over the life of the prime contract,"
and that given revenue projections through December 2012 and
GLS's obligation to Shee Atika, "it is likely that [a lawsuit
brought by Shee Atika] will be successful to the tune of about
$8.5 [million]."  Dkt. No. 67 Ex. 4.  This concern is echoed in
a June 29, 2010, e-mail chain between Agrati, Houck, and Anne
Street, in which Houck repeats Agrati's assessment.  Id. Exs. 5,
13.

    Later, on July 26, 2010, Agrati wrote to Houck, Street, and
Gerry Decker that "to get SAL to 15% workshare [sic] under the
current contract [GLS would] have to take linguists from other"
subcontractors, and that "it remains to be seen if the linguists
in those companies will be enough to get SAL to 15%."  Id. Ex.
6; see also Ex. 8 (July 19, 2010, e-mail from Agrati to Houck
stating that Agrati had told Arsenault "that it would be
virtually impossible to get [Shee Atika] to 15% on the current
contract").

Consistent with these concerns and evidence of GLS's effort to meet the 15% work share requirement, in July 2011, GLS was "[w]orking multiple mitigation plans concerning Shee Akita," including "[m]igrating linguists to Shee Atika" from other subcontractors, as well as calculating work share based on linguist services only. Id. Ex. 12. By measuring the work share based on linguist services and migrating linguists, GLS projected Shee Atika's work share to increase from 10.88% in July 2011 to 12.01% in September 2011; 12.72% in December 2011; 13.32% in March 2012; 13.90% in June 2012; 14.47% in September 2012; and 15% in December 2012. Id.; see also Ex. 14 (May 10, 2011, e-mail from Charles Tolleson, GLS's President and General Manager, identifying Shee Atika as "an issue well into the future" and projecting Shee Atika's work share as 10.98% in June 2011; 12.85% in December 2011; and 15.11% in December 2012). Indeed, SAL's own analysis of Shee Atika's work share demonstrates that for each month between August 2011 and June 2012, Shee Atika actually received 12-13% of total Prime Contract revenue and 15-16% of linguist services revenue. Dkt. No. 67 at Ex. 25 (Analysis of Shee Atika Workshare current as of December 18, 2013). And according to the Affidavit of Adam Suiter, GLS's Chief Financial Officer, as of June 2012, when Shee Atika began declining new work, "GLS had provided [Shee

17

Atika] with workshare [sic] equal to 15.64% based on linguist services."  Suiter Aff. ¶ 4.

Given the clear evidence of Shee Atika's increasing percentage of the work share, SAL's focus on its lower-than-expected work share in 2010 and 2011 is insufficient to make out a breach of contract claim against GLS because there is no dispute that the 15% work share was to be calculated at the end of the Subcontract, which because of the options exercised by the Army, extended to July 3, 2013.[5]  Moreover, there was no guarantee within any of the contract documents that the 15% work share was tied to any particular time period (such as a month, for example); rather, it was to be determined over the life of the Subcontract.  Given the "indefinite" nature of ID/IQ contracts, which allow for fluctuations in the quantity of work required, tying the work share obligation to a rigid time table was clearly not part of the parties' agreement.

The Court finds no evidence that GLS ever repudiated the work share provision of the Subcontract.  Shee Atika's failure to achieve 15% of the work share was the result of its own conduct when it stopped performing because it had dissolved.

---

[5] The extension of the Prime Contract was not considered in GLS's 2010 and 2011 projections indicating that it might not be possible to meet the 15% work share.  Those projections were based on the December 5, 2012, termination date.  See Dkt. No. 67, Exs. 12, 14.

For all these reasons, GLS is entitled to summary judgment on SAL's claim that GLS breached the work share provision of the Subcontract.

### 2. Prompt Payment Provision

Under the Subcontract, GLS agreed "to review Subcontractor's invoices promptly upon submission" and that "unless GLS notifies Subcontractor of a discrepancy within five (5) calendar days of GLS's receipt of such invoice, Subcontractor shall submit the invoice to Accounts Payable" and "the invoice shall be deemed acceptable and GLS shall pay Subcontractor . . . regardless of whether GLS subsequently discovers a discrepancy with such invoice." Art. XIV. Article XIV further provides that "GLS will remit payment to Subcontractor within ten (10) business days of receipt of payment to GLS for Subcontractor's services . . . but such payment shall not exceed 60 days from receipt of an acceptable Subcontractor invoice."

Federal Acquisition Regulation ("FAR") 52.216-7, as incorporated into the Subcontract, provides that "[a]t any time before final payment, GLS may have [Shee Atika]'s invoices or vouchers and statements of costs audited. Any payment may be (1) Reduced by any amounts found by GLS not to constitute allowable costs; or (2) Adjusted for overpayments or underpayments made on preceding invoices or vouchers." Article

19

XXVI of the Subcontract, entitled "Offset," further provides that "GLS may deduct from any payments due to [Shee Atika] under this Subcontract any amounts due, or claimed to be due, to GLS or Owner from [Shee Atika]."

SAL argues that under Article XIV, GLS was obligated to pay on invoices it deemed acceptable, whether or not those invoices included costs that were later disallowed by DCAA, and that GLS was in no way justified in offsetting any funds withheld by the Army against Shee Atika's later invoices because of the DCAA audit.  In SAL's view of the Subcontract, once GLS approved an invoice, GLS was responsible for seeking payment from the Army, and it was also GLS that ultimately bore the risk if the Army determined that Shee Atika's invoice was not acceptable.  Thus, DCAA's questions and the Army's decision to withhold funds from GLS cannot excuse GLS's decision to withhold the same funds from Shee Atika, which SAL argues constitutes a material breach of the prompt payment provision of the Subcontract.  SAL goes on to argue that Article XXVI's offset provision and FAR 52.216-7 cannot be read to "trump" Article XIV's prompt payment provision because such a reading would allow GLS to simply ignore its obligations under Article XIV.  Dkt. No. 53 at 22-25; Dkt. No. 67 at 23-24.

In response, GLS argues that both Article XXVI and FAR
52.216-7 gave it the right to withhold payment from Shee Atika
for previously reimbursed costs that were later found to be
unallowable by DCAA.  GLS points out that there is no dispute
that certain bills submitted by Shee Atika were not allowable
and that Shee Atika conceded that more than $1.3 million of its
charges were not allowable and agreed to give GLS a credit for
that amount.[6]  Dkt. No. 58 at 21-24.

GLS goes on to argue that the prompt payment provision SAL
relies on cannot be read to provide an absolute right to payment
given the incorporation into the Subcontract of FAR 52.216-7.
GLS argues that under FAR 52.216-7, INSCOM, acting through DCAA
and GLS, has the right to audit Shee Atika's invoices at any
time, a right SAL does not dispute.  GLS further argues that
SAL's interpretation of the Subcontract would render this FAR
provision meaningless.  Dkt. No. 58 at 23.

Finally, GLS argues that SAL's interpretation of Article
XIV is simply incorrect.  Under that provision, GLS's obligation

---

[6] The parties appear to dispute the amount of the credit.  See
PSUMF ¶ 34 ("Consistent with its Certified Claim, [Shee Atika]
issued GLS a credit against outstanding payment requests of at
least $1,325,008.40."), DSUMF ¶ 58 ("[Shee Atika] concurred with
parts of DCAA's audit findings, including agreeing that $1.6
[million] of the DCAA questioned costs were unallowable,
excluding them from [its] claim.").  Notwithstanding this
dispute, the existence of the credit demonstrates that Shee
Atika conceded that GLS was entitled to recoup some portion of
the amount withheld by the Army.

to notify Shee Atika "of a discrepancy within five (5) calendar days" of receipt of an invoice and its obligation to pay Shee Atika "regardless of whether GLS discovers a discrepancy with such invoice" depend on a proper understanding of "discrepancy," which GLS argues refers only to differences and inconsistencies between Shee Atika's invoice and its supporting documentation. The DCAA audit finding that Shee Atika's costs were not allowable is not a "discrepancy," GLS argues; thus, Article XIV does not apply.  Id. at 23-24.

GLS's arguments here are well taken.  SAL's argument that Article XXVI conflicts with the prompt payment provision in Article XIV and should, therefore, be ignored is contrary to the express terms of the Subcontract, which requires that any inconsistencies or conflicts between provisions "shall be resolved by applying the most reasonable interpretation under the circumstances."  Art. VI.  Moreover, Virginia law requires that an interpretation of a contract not render a term meaningless.  City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc., 628 S.E.2d 539, 541 (Va. 2006); see also Adolf Jewelers, Inc. v. Jewelers Mut. Ins. Co., 614 F. Supp. 2d 648, 656 (E.D. Va. 2008).

On the one hand, Article XIV provides a process for invoicing and payment that is specific to the parties.  All of

22

its timing requirements apply only to GLS and Shee Atika and describe how and when invoices should be submitted by Shee Atika, how long GLS can review them for "discrepancies," and when they must be paid.  Article XXVI, on the other hand, provides relief for GLS when the Army rejects a subcontractor's claims for certain payments not deemed allowable, as occurred in this case.  SAL may be correct that when the Subcontract was being negotiated, GLS assumed some of the risk that the government might contest costs invoiced by Shee Atika and withhold payment from GLS on that basis.  But the record does not support the conclusion that GLS assumed all of that risk; otherwise, Article XXVI would not have been included in the Subcontract.

As to whether "discrepancies" under Article XIV also includes "questions," "contests," "claims," or other challenges from the Army or DCAA, GLS again has the better argument.  A full reading of Article XIV shows that "discrepancies" is limited to improprieties in invoices as submitted by Shee Atika to GLS that are attributable to either party:

> Unless the discrepancy is due to GLS providing incorrect data related to the invoice, discrepancies in invoices may result in a delay of payment pending resolution of discrepancy(s).  Improper invoices shall be returned by GLS to [Shee Atika] for correction, and payment terms will recommence upon receipt of corrected invoice [sic] by GLS. Payment terms are not

affected if the invoice correction is due to incorrect data provided by GLS.

The offset provision in Article XXVI, by contrast, encompasses not only a larger class of contract "actors," including both the parties and the Army, it also includes more expansive language, which lacks any qualification or specification as to the basis for GLS's or the Army's claim against "any payments due." Accordingly, a reasonable interpretation of the Subcontract is that Article XIV governs the invoicing and payment process as it relates to Shee Atika and GLS, while Article XXVI augments or supplements that process as it relates to Shee Atika, GLS, and the Army.

Because the Court finds that GLS's withholding of the $5,373,289 questioned by DCAA from Shee Atika was not a breach of the prompt payment provision, it need not resolve the parties' dispute as to the sufficiency of the documentation supporting Shee Atika's certified claim or decide whether GLS's decision not to submit the claim to the Army was made in bad faith. Notably, SAL does not provide any documentary evidence to support its position that the certified claim was properly substantiated. Moreover, the deposition testimony of SAL's Rule 30(b)(6) designee, Oyer, demonstrates that not all of the relevant documentation was in fact included in the claim, as he admitted that certain documentary support was not included in

24

the claim.  See Oyer Dep. at 149-51, 154, 236-37.  Moreover, it

is uncontested that Shee Atika did not respond to GLS's requests

for more information.  Given its role and responsibilities as

the Prime Contractor, GLS was within its rights to refuse to

pass on to the Army a claim which it did not find adequately

documented.

For these reasons, GLS is entitled to summary judgment on

this element of SAL's breach of contract claim.

### 3. Award Fee Provision

Relying on Section 5.0 of the Statement of Work, SAL argues

that GLS guaranteed Shee Atika 15% of any award fees GLS

received from the Army.  Dkt. No. 53 at 22.  Section 5.0

provides that "[t]he Subcontractor will normally receive the

same Award Fee as the Prime Contractor unless the Subcontractor

presents strong and completing [sic] justification as to why

they [sic] should receive a higher award fee then [sic] the rest

of the GLS team."

In response, GLS argues that its Subcontract with Shee

Atika is a "cost plus fixed fee" subcontract and that SAL's

claim to any portion of GLS's award fees places Section 5.0 of

the Statement of Work in direct conflict with Article IX of the

Subcontract, which provides that "[i]n no event shall the total

fee exceed 5.75%."  And because any conflict within the

Subcontract must be resolved by giving precedent to the Articles

over the Statement of Work, GLS argues that Article IX prevails. Dkt. No. 58 at 19-20; see also Arts. III, IX.

SAL tries to minimize the fixed fee nature of its subcontract by arguing that at least one other subcontractor, L-3, had a fixed fee subcontract with GLS but also received an award fee. Dkt. No. 67 at 22-23. GLS counters that L-3's subcontract provided for a much lower fixed fee, only 1.5% versus Shee Atika's 5.75%, with L-3 accepting the lower fee in exchange for a potential 6.0% award fee, a trade-off that Shee Atika decided to forego in its own subcontract negotiations. Dkt. No. 58 at 21; see also Compl. Ex. O; Arsenault Dep. at Ex. 9 (October 31, 2008, e-mail from GLS to Shee Atika and others acknowledging that some, but not all, subcontractors "have an award fee"), Ex. 10 (March 21, 2011, e-mail from GLS stating that subcontractors on cost plus award fee subcontracts would be contacted to coordinate award fee invoicing).

Nowhere in the Articles of the Subcontract is there any mention of award fees or an affirmative obligation on GLS's part to share its award fees with Shee Atika. Award fees are mentioned only in the Statement of Work, which is trumped by Article IX. It is also undisputed that Shee Atika's subcontract with GLS is a cost plus fixed fee contract, and not a cost plus award fee contract. See Art. IX; see also DSUMF ¶¶ 43-44;

26

Arsenault Dep. at 72-78 (stating that Shee Atika did not expect
an award fee when drafting the Subcontract and never requested
any portion of an award fee during the Subcontract's term), Ex.
11 (letter from Shee Atika stating that "[t]his [S]ubcontract is
a Cost Plus Fixed Fee (CPFF), Level-of-effort, Indefinite
Delivery, Indefinite Quantity (IDIQ) contract with a fixed fee
not to exceed 5.75% of total estimated costs").

Moreover, the record unambiguously establishes that Shee
Atika never expected an award fee.  GLS correctly argues that
during the years they worked together Shee Atika never asserted
any right to any portion of award fees until it filed this
lawsuit, and that Shee Atika has admitted that it did not
bargain for a portion of award fees, never submitted invoices
for award fees, and never made any request for payment of award
fees.  Dkt. No. 58 at 20-21; see also Arsenault Dep. at 68-69,
Ex. 8 (August 15, 2008, e-mail from Mike Miller to Arsenault
stating that he "do[es] not believe [GLS's] request for a
breakdown of award fee applies to [Shee Atika] as [Shee Atika
is] on a fixed fee").

Given the express language of the Subcontract's Article IX
and the undisputed, material facts that SAL never negotiated for
or expected an award fee, SAL's position is unsupported by the

evidence and GLS is entitled to summary judgment on this breach of contract claim.

C. GLS's Motion for Summary Judgment on Count II (Unjust Enrichment)

In the summer of 2010, the parties met to discuss a possible teaming agreement to bid on a new prime contract with the Army, the "DLITE" contract, which was to follow the Prime Contract at issue in this litigation. The parties never executed a teaming agreement, and GLS was awarded the DLITE contract in July 2011. Compl. ¶¶ 70, 71, Ex. Y; Dkt. No. 58 at 29-30; Arsenault Dep. at 167-70; Dkt. No. 67 Ex. 4.

In Count II of its Complaint, SAL alleges under a theory of unjust enrichment that it is entitled to unspecified damages stemming from GLS being awarded the DLITE contract. Specifically, SAL argues that Shee Atika went out of its way to work with GLS to win the Prime Contract with the Army and that GLS has admitted that Shee Atika was a "major contributor" to the Prime Contract's success. SAL claims that this past performance was responsible for GLS winning the DLITE contract, which "never would have been awarded [to GLS] but for [Shee Atika]." Dkt. No. 67 at 28-30; see also Compl. ¶ 105.

GLS correctly argues that there is no evidence in this record that Shee Atika's performance on the Prime Contract had

anything to do with the Army awarding the DLITE contract to GLS.[7]
In fact, Shee Atika actually competed against GLS for the DLITE
contract, and if Shee Atika's work was deemed so valuable, one
might question why the DLITE contract was awarded to GLS and not
to SAL's team.  GLS further argues that SAL does not allege any
damages for unjust enrichment, only for breach of contract, and
that for all these reasons, Count II of the Complaint should be
dismissed.  Dkt. No. 58 at 29-30.

SAL offers no evidence to support its claim for unjust
enrichment independent of its claim for breach of contract – no
deposition testimony, no documents, nothing.  Count II also does
not allege any basis for awarding damages.  For all these
reasons, SAL has not carried its burden to produce more than a
"scintilla of evidence" in support of its position, Anderson,
477 U.S. at 252, and GLS is therefore entitled to summary
judgment on Count II.

### III.  CONCLUSION

For the reasons stated above, SAL's motion for summary
judgment on Count I (breach of contract) will be denied and

---

[7] Were SAL's arguments given any credence, it would open the
floodgates to lawsuits from former subcontractors seeking a
share of their former prime contractors' subsequent contracts,
even when they were not parties to those subsequent contracts,
solely on the ground that their prior work enhanced the prime
contractors' reputations, which then led to the prime
contractors' being awarded new contracts.

GLS's cross-motion for summary judgment on Counts I (breach of contract) and II (unjust enrichment) will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 1st day of August, 2014.

Alexandria, Virginia

_____ /s/

Leonie M. Brinkema
United States District Judge

30